1
2
3
4
5
6
7

8            **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   TONY SILVA,                          CASE NO. CV F 05-0222 REC LJO

12                 Plaintiff,        **FINDINGS AND RECOMMENDATIONS ON
                                      SOCIAL SECURITY COMPLAINT**
13         vs.                        (Docs. 12, 15.)

14   JO ANNE B. BARNHART,
     Commissioner of Social Security,
15
                   Defendant.
16   _____/

17                          **INTRODUCTION**

18         Plaintiff Tony Silva ("plaintiff") seeks this Court's review of an administrative law judge's

19   ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits under

20   Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Based on review of the Administrative

21   Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social

22   Security ("Commissioner"), this Court RECOMMENDS to DENY plaintiff's request to reverse the

23   Commissioner's decision that plaintiff was disabled no earlier than January 1, 2000 or to remand for

24   further proceedings.

25                          **BACKGROUND**

26                       **Personal Background**

27         Plaintiff is age 69 and has a 12th grade education and past relevant work as a tire quality control

28   technician.  (AR 25, 41, 42, 54, 189, 194, 197.)

                                    1

**Administrative Proceedings**

*Plaintiff's Original And Operative Application*

On December 8, 1994, plaintiff filed his application for disability insurance benefits to claim disability since August 8, 1994 due to heart disease, blood disorder, status post heart bypass surgery, stress, arm, leg and shoulder weakness, and chest, joint and upper extremities pain.  (AR 25, 440, 453.) With its January 27, 1995 notice, the Social Security Administration ("SSA") denied plaintiff's claim and determined plaintiff's condition did not prevent him to work.  (AR 427.)  On February 15, 1995, plaintiff filed his Request for Reconsideration to note: "I have since retired and my job is no longer being conducted by anyone."  (AR 422.)  With its March 21, 1995 notice, SSA denied plaintiff's claim and concluded plaintiff was capable to return to his job.  (AR 424.)

On May 3, 1995, plaintiff through counsel, filed his Request for Hearing by Administrative Law Judge to claim inability to perform substantial gainful activity due to his heart, leukemia, blood disorder, high blood pressure, left leg and back.  (AR 421.)  After an April 21, 1997 hearing (AR 38-50), the ALJ issued his June 26, 1997 decision to determine plaintiff was not disabled and that plaintiff retained the residual functional capacity to perform medium level work, including his past relevant work as a tire quality control technician.  (AR 24, 735.)

Plaintiff submitted to SSA's Appeals Council a Request for Review of Hearing Decision, and with its April 20, 1999 order, the Appeals Council vacated the June 26, 1997 ALJ decision and remanded to the ALJ to: (1) obtain updated treating source medical records; (2) obtain a consultative examination and medical source statement as to plaintiff's abilities despite his impairments; and (3) consider the entire record, including plaintiff's contentions and additional evidence from plaintiff's treating physicians.  (AR 735-736.)

After a July 6, 1999 hearing (51-108), the ALJ issued his September 22, 1999 decision to determine that plaintiff was not disabled and retained the residual functional capacity to perform light work, including his past relevant work as a tire quality control technician.  (AR 827.)  Plaintiff submitted to the Appeals Council his November 4, 1999 Request for Review of Hearing Decision/Order to appeal the ALJ's September 22, 1999 decision.  (AR 831.)  With its April 19, 2001 order, the Appeals Council vacated the September 22, 1999 decision and remanded to the ALJ to obtain a consultative internal

1  medicine examination and medical source statement as to plaintiff's abilities despite his impairments

2  and to obtain medical and vocational expert testimony.  (AR 843.)

3  After a January 8, 2002 hearing (AR 109-146), the ALJ issued his May 30, 2002 to conclude

4  plaintiff was disabled as of January 1, 2000 but that prior to that date, plaintiff retained the residual

5  functional capacity to perform light work, including his past relevant work as a tire quality control

6  technician.  (AR 32.)  Plaintiff submitted to SSA's Appeals Council an August 5, 2002 Request for

7  Review of Hearing Decision (AR 1221), and on December 27, 2004, the Appeals Council denied

8  plaintiff's request for review to render the ALJ's May 30, 2002 decision as the Commissioner's final

9  decision subject to this Court's review.  (AR 11.)

10                              ***Plaintiff's Subsequent Application***

11  During proceedings on his original application, plaintiff, on February 7, 2000, protectively filed

12  another application for disability insurance benefits to claim disability since January 24, 2000 due to

13  heart disease and blood platelet problem.  (AR 173, 188.)  With its May 12, 2000 Notice of Disapproved

14  claims, SSA denied plaintiff's claim and determined plaintiff's condition was not severe enough to

15  prevent him to work.  (AR 162.)  On July 10, 2000, plaintiff filed a Request for Reconsideration to claim

16  he was "totally disabled."  (AR 166.)  With its September 20, 2000 Notice of Reconsideration, SSA

17  denied plaintiff's claim and again determined that plaintiff's condition was not severe enough to prevent

18  him to work.  (AR 167.)

19  On October 10, 2000, plaintiff filed his Request for Hearing by Administrative Law Judge to

20  claim he is "totally disabled."  (AR 171.)  According to plaintiff, plaintiff's original December 8, 1994

21  and subsequent February 7, 2000 applications were combined in connection with the May 30, 2002 ALJ

22  decision at issue here.

23                          **Medical History And Records Review**[1]

24                          ***K.W. Melashenko, M.D., Treating Physician***

25  On October 3, 1989, plaintiff suffered a left knee medial collateral ligament strain when on job

26  as a tire quality control technician at Pirelli Armstrong Tire Company.  (AR 568.)  Plaintiff briefly

27  _____

28  [1]    Review of the medical evidence will focus on plaintiff's treatment prior to January 1, 2000, the disability onset date determined by the ALJ.

1  treated with K.W. Melashenko, and his knee returned to normal within a few weeks.  (AR 557-558.)

2  ### Hanford Community Medical Center

3  On February 12, 1992, plaintiff was admitted to Hanford Community Medical Center for a

4  coronary angiography and right heart catheterization to rule out high grade coronary artery disease in

5  light of plaintiff's shortness of breath on exertion.  (AR 511, 512.)  Plaintiff was assessed with unstable

6  angina pectoris, hypertensive cardiovascular disease, and hypercholesterolemia.   (AR 512.) The

7  angiography revealed coronary artery blockage.  (AR 546.)

8  ### Dale L. Merrill, M.D., Treating Cardiologist

9  Plaintiff treated with cardiologist Dale L. Merrill, M.D. ("Dr. Merrill").  Dr. Merrill conducted

10  a November 4, 1992 stress echocardiogram which produced generally normal results which were

11  "reassuring in terms of stability of the patient's coronary artery disease." (AR 631, 632.)  On April 24,

12  1993, after plaintiff complained of burning anterior chest discomfort on exertion, Dr. Merrill admitted

13  plaintiff to St. Agnes Medical Center for an coronary angiography based on new onset angina.  (AR 627,

14  630.) An April 28, 1993 treadmill stress test revealed angina pectoris, greater exercise performance and

15  decreased discomfort.  (AR 624.)  Dr. Merrill performed an April 30, 1993 coronary angioplasty of left

16  anterior descending.  (AR 621.)  As of May 27, 1993, a month after plaintiff's double vessel coronary

17  artery bypass grafting, Dr. Merrill noted that plaintiff was "progressing well at home without angina"

18  and that plaintiff's platelet count was into the 300,000s.  (AR 619.)  Dr. Merrill discussed a home

19  walking program.  (AR 619.)  A June 30, 1993 exercise summary revealed good exercise tolerance and

20  absence of angina pectoris and subendocardial ischemia.  (AR 614.)  Dr. Merrill conducted a June 30,

21  1993 stress echocardiogram which revealed anteroseptal hypokinesia with normal left ventricular

22  ejection fraction and absence of pericardial effusion or angina.  (AR 608, 609.)  Dr. Merrill noted

23  plaintiff's good progress on his self-directed exercise program, satisfactory residual cardiac function,

24  and platelet count reduced to normal range.  (AR 608.)  Dr. Merrill anticipated to release plaintiff to

25  work in September 1993.  (AR 608.)  On August 30, 1993, Dr. Merrill noted that plaintiff "is

26  progressing well but has not been particularly aggressive in physical exertion or dietary management"

27  and that plaintiff's platelets had been reduced satisfactorily with Hydroxyurea. (AR 510.)  Dr. Merrill

28  assessed stable coronary artery disease, hypertension, controlled, and thrombocytosis, controlled.  (AR

4

510.) Dr. Merrill concluded that plaintiff could return to work on September 15, 1993. (AR 510.)

On February 28, 1994, Dr. Merrill noted that plaintiff was getting along well without angina and had "not been good about his walking." (AR 509.) Dr. Merrill assessed stable coronary heart disease and essential thrombocytosis on low dose of Hydroxyurea and recommended plaintiff to increase walking. (AR 509.) Plaintiff's August 22, 1994 treadmill testing revealed normal heart rate and blood pressure response to exercise, excellent exercise tolerance, marked improvement from April 28, 1993 treadmill testing, and absence of angina pectoris and subdendocardial ischemia. (AR 500, 508.) Dr. Merrill encouraged plaintiff to increase plaintiff's daily exercise and to reduce plaintiff's excess weight. (AR 500.)

As of February 4, 1997, Dr. Merrill noted that plaintiff "is doing well clinically without angina, heart failure, or arrhythmia symptomatology." (AR 723.) Dr. Merrill found stability of plaintiff's coronary disease without active ischemia. (AR 723.)

### *S. Dean Hsu, M.D., Treating Oncologist*

Plaintiff treated with oncologist S. Dean Hsu, M.D. ("Dr. Hsu"). On February 14, 1993, Dr. Hsu assessed essential thrombocytosis, rule out thrombocytosis, coronary artery disease history, hypertension and hyperlipidemia. (AR 547.) Dr. Hsu recommended bone marrow aspiration, biopsy and computerized tomography ("CT") scan of plaintiff's abdomen and pelvis. (AR 547.) Biopsies revealed moderate increase in megakaryocytes but neither metastatic disease nor myelofibrosis. (AR 544, 545.) On February 18, 1993, Dr. Hsu confirmed his diagnosis of essential thrombocynthemia to be treated with Hydroxyurea 500 mg. (AR 544.) On March 4, 1993, Dr. Hsu noted that plaintiff is a high risk for a further cardiovacular event, will need one aspirin daily, and has tolerated Hydrea well. (AR 543.) On April 8, 1993, Dr. Hsu noted absence of chest pain and bone pain, dyspnea, leg edema or petechiae. (AR 540.) On June 2, 1993, Dr. Hsu noted reduction in plaintiff's platelet count from 600,000 to 400,000 and improvement. (AR 539.) On July 29, 1993 and August 26, 1993, Dr. Hsu noted that plaintiff was "doing very well" with absence of chest, bone or leg pain, dyspnea, headache, dizziness, and leg cramps. (AR 538.) Dr. Hsu assessed essential thrombocythemia under control. (AR 538.) On September 23, 1993, Dr. Hsu found plaintiff's platelet count "well controlled" and noted the absence of chest or bone pain, dizziness, headache, and night sweats. (AR 536.) On November 4, 1993 and December 16, 1993,

1   Dr. Hsu noted that plaintiff was "doing very well" and had neither definite functional impairment,

2   dizziness, headache, leg pain, chest pain, dyspnea nor side effects from Hydrea.  (AR 535, 536.)

3   Plaintiff's platelet count was below 290,000.  (AR 535, 536.)

4       In spring 1994, Dr. Hsu noted that plaintiff was doing "fairly well" with no thromboembolic

5   problems, chest pain or bone pain, dyspnea, night sweats, headache, or leg cramps.  (AR 532, 535.)

6   Plaintiff's platelet count was under control.  (AR 532.)  In summer and fall 1994, Dr. Hsu noted that

7   plaintiff was doing "very well" with no recurrent chest or bone pain, dyspnea, night sweats,

8   thromboembolic problems, headaches or dizziness.  (AR 528, 531.)

9       In 1995, Dr. Hsu continued his favorable reports that plaintiff was doing "very well" with no

10  chest or bone pain, dyspnea, night sweats, thromboembolic problems, nausea, dizzy spells, headaches

11  or side effects from Hydrea.  (AR 525, 527, 528.)  Dr. Hsu found plaintiff's platelets under control.  (AR

12  524.)  In 1996, Dr. Hsu consistently noted plaintiff's "well controlled" platelet count and absence of

13  chest or bone pain, dyspnea, headaches, bleeding or thrombolic problems.  (AR 715-717.)  Dr. Hsu

14  recommended "a more active life style and exercise program" to address plaintiff's weight.  (AR 715.)

15      In early 1997, Dr. Hsu noted plaintiff was "doing very well" with his essential thrombocytosis

16  and experienced no chest or bone pain, dyspnea, night sweats, headaches or thromboembolic problems.

17  (AR  708, 712.) As of January 21, 1997, plaintiff experienced neither thrombophlebitis nor further

18  anginal pain but complained of slight joint pain and fatigue.  (AR 709.)  Notes reflect that plaintiff had

19  been less active to cause his symptomatology and that his medication to control his platelet count "is

20  quite modest."  (AR 710.)  In May and June 1997, Dr. Hsu noted that plaintiff was "doing well" and

21  experienced no chest or bone pain, dyspnea, night sweats, headaches, dizziness, thromboembolic

22  problems or Hydrea side effects.  (AR 774,775.)  Dr. Hsu assessed essential thrombocytosis, controlled

23  with Hydrea, and arteriosclerotic heart disease.  (AR 774, 775.)  On August 21, 1997, plaintiff started

24  to complain of leg puffiness and swelling, easy fatigue and inability to caring out daily activities.  (AR

25  773.)  Dr. Hsu diagnosed essential thrombocytosis and arteriosclerotic heart disease and added fluid

26  retention to his diagnosis.  (AR 773.)  During the remainder of 1997, plaintiff complained of fatigue,

27  weakness, leg swelling, diarrhea, headache and occasional chest tightness.  (AR 770-772.)

28      Dr. Hsu completed an August 30, 1997 questionnaire to note that plaintiff's impairments of

1    coronary disease, essential thrombocytosis and mild obesity restrict plaintiff to no more than sedentary

2    work.  (AR 737.)  Dr. Hsu based such assessment on plaintiff's coronary angioplasm finding, elevated

3    platelet count and abnormal bone marrow findings.  (AR 737.)  Dr. Hsu assessed that plaintiff is able

4    to sit or stand two hours during an eight-hour day and walk two or three miles but must lie down or

5    elevate his legs every two or three hours.  (AR 737.)  Dr. Hsu restricted plaintiff from extreme

6    temperatures, high altitude and high stress work.  (AR 737.)

7        On October 16, 1997, Dr. Hsu started plaintiff on Agrylin, a new drug to treat thrombocytosis.

8    (AR 772.)  On November 20, 1997, plaintiff's platelet count decreased to 281,000, and Dr. Hsu

9    continued plaintiff on Agrylin .5 mg.  (AR 771.)  On December 18, 1997, Dr. Hsu continued plaintiff

10   on Agrylin .5 mg and assessed essential thrombocytosis and arteriosclerotic heart disease.  (AR 770.)

11       On March 19, 1998, Dr. Hsu attributed plaintiff's fatigue and hunger sensation to possible

12   hypoglycemia.  (AR 769.)  On April 30, 1998, Dr. Hsu assessed that plaintiff's essential thrombocytosis

13   responded well to Agrylin, that plaintiff's arteriosclerotic heart disease was "doing fairly well," and that

14   plaintiff's fatigue may be due to his weight and cardiac problems.  (AR 768.)  Dr. Hsu criticized that

15   plaintiff "does not watch his weight closely." (AR 768.)  During summer 1998, Dr. Hsu noted plaintiff's

16   absence of recurrent thromboembolic problems and assessed essential thrombocytosis, controlled with

17   Agrylin and mild edema of the leg from mild venous insufficiency.  (AR 765, 766.)  On October 15,

18   1998, Dr. Hsu noted that plaintiff "found a maintenance job at a local extended care facility and seems

19   to be doing well." (AR 764.)  Dr. Hsu assessed that plaintiff "seems to be doing well" and encouraged

20   an exercise program for plaintiff.  (AR 764.)  On December 17, 1998, Dr. Hsu assessed essential

21   thrombocytosis with plaintiff's platelet count well under control and neither recurrent chest pain,

22   thromboembolic problems nor bleeding tendency.  (AR 763.)

23       In 1999, Dr. Hsu noted that plaintiff experienced neither significant nor recurrent problems,

24   assessed essential thrombocytosis, "responding very well to Agrylin," and emphasized the need for

25   exercise and calorie reduction.  (AR 759-762.)

26                    ***Richard A. Lusby, M.D., Treating Physician***

27       Plaintiff treated with Richard A. Lusby, M.D. ("Dr. Lusby"). Dr. Lusby completed a January 6,

28   1994 form to indicate that plaintiff was disabled as of April 24, 1993 due to open heart surgery.  (AR

522.)  August 12, 1994 notes reflect that plaintiff wanted to "discuss possible disability" in that he could not find work and "has multiple problems."  (AR 519.)  Plaintiff complained of recurrent chest pain.  (AR 519.)  On October 3, 1994, plaintiff experienced chest pain and increased stress.  (AR 519.)

On January 31, 1995, plaintiff complained of chest pressure, shortness of breath and being under pressure.  (AR 518.)  Dr. Lusby completed a July 10, 1995 Physical Capacities Evaluation to conclude that plaintiff was able to: (1) sit and stand two hours at a time during an eight-hour workday; (2) walk one hour at a time during an eight-hour workday; (3) sit, stand or walk two hours during an eight-hour workday; (4) lift/carry up to 20 pounds occasionally; (5) repetitively use his hands for simple grasping, pushing/pulling of arm controls and frequent manipulation; and (6) occasionally bend, squat, crawl and reach.  (AR 517.)  Dr. Lusby noted that plaintiff was unable to use his feet for repetitive movements and to climb and was restricted from unprotected heights and exposure to marked changes in temperature and humidity.  (AR 517.)

April 27, 1995 notes reflect that plaintiff experienced chest pressure on mild exertion.  (AR 656.)  As of June 13, 1995, plaintiff was "feeling fine" although he experienced chest pain on exertion and claimed inability to exercise.  (AR 656.)

Dr. Lusby completed a September 16, 1997 Questionnaire to conclude that plaintiff's coronary artery disease and thrombocytosis prevented plaintiff to work.  (AR 749.)  Dr. Lusby assessed that plaintiff was able to sit, stand or walk two hours during an eight-hour day and must lie down or elevate his legs every two or three hours during an eight-hour day.  (AR 749.)  Dr. Lusby noted that plaintiff had been disabled since September 1994.  (AR 749.)

Dr. Lusby completed a California disability form to noted that plaintiff's achilles tendinitis and right foot plantar fascitis disabled plaintiff during May 28, 1999 to July 1, 1999.  (AR 1054.)  Dr. Lusby noted no other disabling conditions.  (AR 1054.)

### *Residual Physical Functional Capacity Assessment*

A California Disability Determination Services ("DDS") physician completed a January 17, 1995 Residual Physical Functional Capacity Assessment to conclude that plaintiff was able to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry

8

restrictions. (AR 433.) The DDS physician found neither postural, manipulative, visual, communicative nor environmental limitations. (AR 434-436.) The DDS physician noted that plaintiff's exercise tolerance was excellent without angina or eschemia and that plaintiff experienced no chest pain and was doing well. (AR 439.) A second DDS physician affirmed the assessment. (AR 432.)

DDS physician Michael F. Escobar, M.D. ("Dr. Escobar"), a board certified internist, completed a May 10, 2000 Physical Residual Functional Capacity Assessment to conclude that plaintiff was able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift carry restrictions. (AR 349.) Dr. Escobar assessed neither postural, manipulative, visual, communicative nor environmental limitations and adopted the ALJ's September 22, 1999 decision. (AR 350-354.)

DDS physician Alfred Torre, M.D. ("Dr. Torre"), completed a September 13, 2000 Physical Residual Functional Capacity Assessment to conclude that plaintiff was able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry restrictions. (AR 412.) Dr. Torre assessed neither postural, manipulative, visual, communicative nor environmental limitations. (AR 413-415.) Dr. Torre concluded that plaintiff's condition was not severe enough to meet or equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

START                    ***Alvin Y. Au, M.D., Treating Internist***

Dr. Lusby referred plaintiff to internist Alvin Y. Au, M.D. ("Dr. Au"), who on December 7, 1995, recommended a colonoscopy to rule out colon cancer, colitis, etc. and an upper endoscopy. (AR 649.) On December 13, 1995, plaintiff underwent the procedures which revealed internal hemorrhoids and upper gastrointestinal symptoms from esophagitis. (AR 646.) A December 13, 1995 gastric cardia biopsy was unremarkable. (AR 644.) On January 4, 1996, Dr. Au continued plaintiff on Zantac 150 mg and an anti-reflux regimen. (AR 643.) In 1996 and 1997, plaintiff had no complaints and was assessed with gastroesophageal reflux disease symptoms, doing well on Pepcid. (AR 639, 642, 733.) On November 18, 1999, Dr. Au recommended a full colonoscopy. (AR 1030.)

***Central Valley Comprehensive Care***

Plaintiff treated at Central Valley Comprehensive Care.  On January 9, 1997, plaintiff was assessed with coronary artery disease and thrombocytosis. (AR 908, 1086.) In September 1997, plaintiff complained of leg swelling.  (AR 315, 320, 904, 905, 1083, 1084.)  February 1998 notes reflect that plaintiff experienced joint pain and stiffness, slow heart rate and peripheral vascular complications.  (AR 308, 314, 892, 900, 1080, 1082.)  On June 2, 1998, plaintiff was assessed with high blood pressure, thrombocytosis and coronary artery disease.  (AR 292, 814.)

On April 6, 1999, plaintiff was assessed with coronary artery disease, thrombocytosis and plantar fascitis.  (AR 289, 874, 1069.)  On April 20, 1999, plaintiff noted right foot improvement and was assessed with coronary artery disease, thrombocytosis and possible transient ischaemic attack ("TIA"). (AR 283, 872, 1067.)  On May 4, 1999, plaintiff noted medication improved his right foot and was assessed with coronary artery disease and plantar fascitis.  (AR 282, 812.)  On May 28, 1999, plaintiff was assessed with coronary artery disease, thrombocytosis and achilles tendinitis.  (AR 279, 863, 1057.) On July 12, 1999, plaintiff was assessed with right foot plantar fascitis.  (AR 274, 865.) On October 27, 1999, plaintiff complained of mild headaches and was assessed with coronary artery disease, gastritis and hypertension.  (AR 271, 856, 1050.)  On November 8, 1999, plaintiff complained of increased right foot pain and was assessed with esophageal reflux.  (AR 263, 855, 1049.)

On January 24, 2000, plaintiff complained of chest pain for the past 10 days and was assessed with coronary artery disease and thrombocytosis.  (AR 264, 852, 1045.)  On May 9, 2001, plaintiff was assessed with coronary artery disease and bilateral shoulder pain.  (AR 1040.)  Plaintiff was prescribed Celebex 200 mg.  (AR 1040.)

***William Edward Hanks, M.D., Treating Cardiologist***

Dr. Lusby referred plaintiff to cardiologist Williams Edward Hanks, M.D. ("Dr. Hanks"), after plaintiff switched health insurance no longer accepted by Dr. Merrill.  (AR 751.)  On March 20, 1998, Dr. Hanks noted that plaintiff had no significant complaints other than occasional shortness of breath with exertion and fatigue. (AR 751.) Dr. Hanks assessed coronary artery disease, diastolic hypertension and thrombocytosis.  (AR 753.)  On May 5, 1998, plaintiff complained that he felt weak, and plaintiff's "ankle swelling disappeared." (AR 252.) Dr. Hanks assessed "[h]ypertension, under control." (AR 252,

750.)  A December 16, 1998 stress test revealed "outstanding exercise capacity" and "unremarkable cardiopulmonary assessment."  (AR 1039.)

On December 22, 1999, plaintiff "confirmed the absence of significant symptoms in the last year."  (AR 252.)  A December 22, 1999 echocardiographic study revealed evidence of neither diastrolic left ventricular dysfunction nor pericardial effusion.  (AR 251, 937.)  A December 22, 1999 stress test revealed "[e]xcellent exercise capacity," negative test for angina pectoris, claudication, arrhythmia, ischemia and scar.  (AR 249, 935.)

On January 24, 2000, Dr. Hanks performed a left and right heart catheterization, left ventriculography, root aortograoy and selective cine coronary angiography.  (AR 227, 913, 1173.)  Dr. Hanks' conclusions included mild systemic hypertension, mildly dilated aortic root, coronary occlusive disease, and no evidence of mitral regurgitation, aortic stenosis or aortic insufficiency.  (AR 229, 915, 1176.)  A February 22, 2000 stress test revealed an unremarkable pressure response to exercise and negative for angina pectoris, claudication and arrhythmia.  (AR 387, 990.)  On March 7, 2000, plaintiff presented with no chest discomfort.  (AR 386, 989.)  On March 23, 2000, Dr. Hanks performed a cardiac catheterization and concluded plaintiff had a dilated aortic root and coronary occlusive disease but no evidence of aoritc stenosis, insufficiency or mitral regurgitation.  (AR 385, 988.)  A June 20, 2000 stress test revealed excellent exercise capacity and suggested ischemia in the distribution of the posterior descending coronary artery.  (AR 1036.)  As of June 20, 2000, Dr. Hanks noted plaintiff's intermittent chest discomfort and near certainty of re-catheterization.  (AR 360, 963.)  A September 26, 2000 stress test revealed exertionally provoked angina pectoris at a low workload and poor exercise capacity.  (AR 1034.)  Dr. Hanks performed an October 4, 2000 left heart catheterization and coronary angioplasty and assessed plaintiff with coronary occlusive disease, left anterior descending completely occluded.  (AR 1108, 1110.)  November 21, 2000 and April 13, 2001 stress tests revealed normal exercise capacity and were negative for angina pectoris, claudication and arrhythmia.  (AR 1031, 1033.)

In his December 4, 2000 letter, Dr. Hanks noted that plaintiff underwent 1993 coronary bypass grafting with an emergency double vessel procedure after unsuccessful PTCA of the left anterior descending coronary artery.  (AR 1010.)  Dr. Hanks noted plaintiff's further problems of hypertension, elevated cholesterol and thrombocytosis.  (AR 1010.)  According to Dr. Hanks, plaintiff's March 2000

1   coronary angiography demonstrated an uncompromised stent in the graft of his anterior descending and

2   that September 2000 treadmill stress testing demonstrated "substantially impaired" exercise capacity.

3   (AR 1010.)  Dr. Hanks concluded: "At this time, his exercise capacity precludes all but the most

4   sedentary of activity with his thrombocytosis and other coronary risks placing him at risk for further

5   acute coronary occlusive problems."  (AR 1010.)

6        Dr. Hanks performed a March 7, 2001 left heart catheterization with a stent to the left anterior

7   descending saphenous vein graft.  (AR 1103.)  Dr. Hanks assessed coronary occlusive disease.  (AR

8   1106.)  An April 13, 2001 stress test revealed excellent exercise capacity and was negative for angina

9   pectoris, claudication and arrhythmia.  (AR 1188.) July 20, 2001 and December 6, 2001 treadmill stress

10  tests revealed plaintiff's excellent exercise capacity and no convincing evidence of ischemia and were

11  negative for angina pectoris, claudication and arrhythmia.  (AR 1178, 1180.)  On October 5, 2001, Dr.

12  Hanks performed a left heart catheterization, left ventriculography, aortic root aortography and coronary

13  angiography.  (AR 1170.) Dr. Hanks concluded plaintiff suffered from coronary occlusive disease.  (AR

14  1172.)

15              ***Robert M. Mochizuki, M.D., Treating Orthopaedist***

16        Dr. Lusby referred plaintiff to orthopaedist Robert M. Mochizuki, M.D. ("Dr. Mochizuki").  In

17  June and July, 1999, plaintiff complained of a painful right heel since May 1999, and Dr. Mochizuki

18  assessed right foot plantar fascitis and noted plaintiff's normal ankle.  (AR 1025, 1026, 1028.)

19  Plaintiff's right foot improved with an injection.  (AR 1023.)

20              ***Bhupinder S. Chatrath, M.D., Treating Oncologist***

21        On September 9, 1999 upon Dr. Lusby's referral, oncologist Bhupinder S. Chatrath, M.D. ("Dr.

22  Chatrath"), evaluated plaintiff's essential thrombocytosis and found plaintiff stable with excellent

23  clinical performance status.  (AR 267, 336, 859, 952.)  Plaintiff denied history of significant headaches

24  but claimed infrequent headaches and was assessed with essential thrombocytosis, hypercholesterolemia,

25  hypertension and coronary artery disease.  (AR 266, 335, 859, 951, 952.)  On November 4, 1999, Dr.

26  Chatrath noted that plaintiff "looks and feels well."  (AR 340, 954.)  Dr. Chatrath assessed essential

27  thrombocytosis, stable platelet count, excellent clinical performance, and absence of clinical evidence

28  of bleeding or thrombotic complications.  (AR 341, 955.)

On January 5, 2000, Dr. Chatrath noted that plaintiff looked and felt "well" and assessed plaintiff's essential thrombocytosis, stable platelet count, absence of clinical evidence of bleeding or thrombotic complications and excellent clinical performance status.  (AR 334, 949.)  On March 2, 2000, Dr. Chatrath noted plaintiff "is doing remarkably well" and had a stent placed after experiencing chest pain several weeks ago.  (AR 338, 941.)  Dr. Chatrath assessed essential thrombocytosis, stable platelet count and excellent clinical performance.  (AR 339, 942.)  During the remainder of 2000, plaintiff presented with no significant complaints, and Dr. Chatrath noted that plaintiff "looks and feels well" and assessed essential thrombocytosis, stable on Agrylin .5 mg, and "[e]xcellent clinical performance status." (AR 1120, 1121, 1124, 1125, 1127, 1128, 1131, 1132, 1136, 1137.)  On August 29, 2000, Dr. Chatrath noted that plaintiff was not compliant in that he took his Agrylin doses two or three times daily rather than four times as prescribed.  (AR 1127.)

During 2001, Dr. Chatrath continued to note that plaintiff "looks and feels well" and was stable on Agrylin and to assess essential thrombocytosis and excellent clinical performance status.  (AR1111-1114, 1117, 1118, 1189-1192.)

### R. Alan Shows, Treating Cardiologist

Plaintiff treated with cardiologist R. Alan Shows, M.D. ("Dr. Shows"), who admitted plaintiff after an abnormal May 27, 2001 electrocardiogram for telemetry after plaintiff presented with increasing chest discomfort, suggestive of unstable angina pectoris.  (AR 1096, 1186.)  Dr. Shows performed a May 28, 2001 coronary angiography, bypass graft angiography and stent placement after plaintiff presented with chest discomfort symptoms.  (AR 1088, 1089, 1181, 1182.)

### Sherry Lopez, D.O., Consultative Internist

Internist Sherry Lopez, D.O. ("Dr. Lopez"), conducted a September 19, 2001 comprehensive internal medical evaluation of plaintiff.  (AR 1145.)  Dr. Lopez noted plaintiff's significant artery disease, 1993 two-vessel coronary artery bypass graft and four subsequent stents.  (AR 1145-1146.) Plaintiff complained of angina with minimal exertion and chest pain from walking or climbing stairs. (AR 1146.)  Dr. Lopez' examination revealed many skin bruises, 5/5 motor strength in upper and lower extremities, and absence of paravertebral muscle spasms and joint tenderness or effusion.  (AR 1148.) Dr. Lopez assessed that plaintiff has significantly impaired performance status and angina with minimal

1  activity to preclude an environment requiring exertion.  (AR 1148.)  Dr. Lopez further assessed that

2  plaintiff was able to: (1) stand/walk up to two hours in a workday; (2) sit less than six hours in a

3  workday; and (3) lift 15 pounds occasionally and 10 pounds frequently.  (AR 1148-1149.)  Because of

4  plaintiff's coronary artery disease, Dr. Lopez concluded:

5        It would not be safe for him to work in any kind of environment, where he would have
       to exert himself or do manual labor.  At this time he is limited to very sedentary activities
6        . . . He pretty much cannot exert himself to do anything.  (AR 1149.)

7  Dr. Lopez further noted that minor exertion would cause angina and in turn a possible cardiac event.

8  (AR 1151.)  Dr. Lopez concluded that plaintiff lacked agility to climb, balance, kneel, crouch, crawl or

9  stoop and is unable to tolerate temperature extremes.  (AR 1151, 1153.)

10                                  *Scripps Green Hospital*

11        On October 5, 2001, plaintiff was admitted to Scripps Green Hospital for a PTCA to restenotic

12  segment and delivery of brachytherapy.  (AR 1168.)  On October 8, 2001, plaintiff underwent a coronary

13  angioplasty and gamma radiation therapy for the saphenous vein graft to the left anterior descending

14  artery.  (AR 1161.)  On October 10, 2001, plaintiff underwent a stent placement and radiation treatment

15  of coronary artery and vein graft stenosis.  (AR 1164.)  On October 13, 2001, plaintiff was discharged

16  with a diagnosis of history of in-stent restenosis, coronary artery disease, hypertension, status post

17  brachytherapy, and pseudoaneurysm status post surgical repair.  (AR 1159.)

18        *Shane H. Tu, M.D., Non-Examining Internist, Hematologist and Oncologist*

19        Pursuant to the Appeals Council's April 19, 1999 order, the ALJ, with his March 12, 2002 letter,

20  requested Shane H. Tu, M.D. ("Dr. Tu"), to complete interrogatories and a medical source statement

21  regarding plaintiff's condition.  (AR 1194.)  Dr. Tu's medical specialties are internal medicine,

22  hematology and medical oncology.  (AR 1204, 1214.)  With his March 19, 2002 letter, plaintiff's

23  counsel "strongly" objected to the ALJ's letter to Dr. Tu on grounds it made "conclusions which should

24  be left to the doctor" and many statements "suggest a negative conclusion is desired."  (AR 1206.)

25        In response to the ALJ's interrogatories, Dr. Tu summarized plaintiff's medical treatment since

26  his April 1993 coronary bypass and noted plaintiff's "very high risk background for coronary artery

27  disease."  (AR 1216.)  Dr. Tu explained that plaintiff's high risk for coronary artery disease did not "by

28  itself meet the criteria for Social Security Disability.  There is a repeated notion of excellent clinical

1   performance status all the way up to January 5, 2000." (AR 1216.)  Dr. Tu placed plaintiff's disability

2   onset at January 1, 2000.  (AR 1217.)  According to Dr. Tu, an experienced cardiologist, Dr. Hanks,

3   concluded that a September 2000 treadmill stress test demonstrated substantially impaired exercise

4   capacity.  (AR 1208.)  Dr. Tu further referenced plaintiff's intermittent chest discomfort since May 1,

5   2000.  (AR 1208.)

6        Dr. Tu completed a March 18, 2002 Medical Source Statement to note that since January 2000,

7   plaintiff was limited to: (1) lifting/carrying and pushing/pulling less than 10 pounds occasionally; (2)

8   standing/walking less than two hours in an eight-hour workday; (3) sitting less than six hours in an eight-

9   hour workday; and (4) occasional kneeling, balancing, crouching and stooping.  (AR 1210-1211.)  Dr.

10   Tu restricted plaintiff from climbing and crawling.  (AR 1211.)

11                          ***Medications***

12        Plaintiff's medications have included Norvasc 10 mg, Pravocol 20 mg and 40 mg, Hydrea 500

13   mg, Calan, and Planex, Prilosec 20 mg, Agrylin .5 mg, Spironolactene 25 mg, Veetids 500 mg,

14   Arthrotec, aspirin 325 mg.  (AR 193, 553, 707, 757, 758, 854.)

15                   **<u>Plaintiff's Activities And Testimony</u>**

16                   ***Reports And Questionnaires***

17        Plaintiff completed a December 8, 1994 Disability Report to claim that he was prevented to work

18   since August 8, 1994 due to open heart surgery, chest pain, abnormal platelet count, two small arteries

19   blocked, hernia, stress and weakness to arms, shoulders and legs.  (AR 453.)  Plaintiff's activities

20   include shopping, light repair, art and painting.  (AR 456.)  Plaintiff is able to drive.  (AR 456.)

21        Plaintiff completed a February 10, 1995 Reconsideration Disability Report to note he

22   experienced elevated platelet count, joint, wrist and shoulder pain, slight foot problems, and weakness

23   from lifting overhead.  (AR 447.)

24        Plaintiff completed a June 1, 1999 California disability form to note that he last worked May 31,

25   1999 as a maintenance assistant at a nursing home.  (1056.)  Plaintiff claimed inability to work as of

26   June 1999.  (AR 1056.)

27        Plaintiff completed a February 11, 2000 Disability Report Adult to note that plaintiff stopped

28   working May 31, 1999 because he was laid off, drew unemployment compensation and attended

1   community college.  (AR 188.)

2       Plaintiff completed an undated Work History Report to note that after his tire quality control

3   technician position, plaintiff was a maintenance worker at a rehabilitation hospital during September

4   1998 to May 1999 and which required him to use tools and lift up to 20 pounds.  (AR 197.)

5       Plaintiff completed a June 30, 2000 Reconsideration Disability Report to note that he tires easily

6   to limit his physical activity.  (AR 205.)

7       Plaintiff completed an August 17, 2000 Daily Activities Questionnaire to note that he leaves his

8   home daily and drives to town or to visit friends and relatives.  (AR 218.) Plaintiff enjoys painting,

9   woodworking and gardening.  (AR 219.)  Plaintiff is unable to work in heat and cold and for an eight-

10  hour day due to tiredness.  (AR 220.)

11                  ***Plaintiff's April 21, 1997 ALJ Hearing Testimony***

12      Plaintiff testified at the April 21, 1997 ALJ hearing that he lives in a house with his wife and

13  adult daughter.  (AR 41.)  Plaintiff drives a sedan and drove to the hearing.  (AR 43.)

14      Plaintiff last worked July 15, 1994 during a strike at the tire manufacturing plant where he

15  worked.  (AR 43.)  Plaintiff did not return to work after the strike because he was forced to retire.  (AR

16  43, 47.)  Plaintiff received California disability benefits for a year after his retirement.  (AR 48.)

17      Plaintiff enjoys gardening and woodworking.  (AR 44.)  Most of the time, plaintiff feels fine.

18  (AR 45.)

19      Plaintiff had open heart bypass surgery in April 1993.  (AR 45.)  Plaintiff has not experienced

20  angina and feels no pain unless he engages in stressful activity.  (AR 46.)  Plaintiff has not experienced

21  a heart attack.  (AR 46.)

22      Plaintiff takes Hydrea, a chemo pill, to control his platelet count to avoid leukemia.  (AR 46.)

23  Plaintiff experiences back strain and muscle aches to preclude him from bending at times.  (AR 48.)

24  Plaintiff has aches and pains in his shoulders and arms.  (AR 49.)  Dr. Lusby and Dr. Merrill restricted

25  plaintiff on weight and lifting above his shoulders.  (AR 49.)

26      Plaintiff's condition prevents him to play softball.  (AR 50.)

27                  ***Plaintiff's July 6, 1999 ALJ Hearing Testimony***

28      Plaintiff testified at the July 6, 1999 ALJ hearing that he lives with his wife and sister-in-law who

1  suffers multiple sclerosis.  (AR 55, 93.)  Plaintiff has a drivers license and drives about 50 miles per

2  week.  (AR 58.)

3      Plaintiff's job as a tire quality control technician at a tire manufacturer involved up and down

4  sitting and standing, sitting for three hours a day and lifting up to 25 pounds.  (AR 67, 68.)  He resumed

5  the job after his 1993 coronary bypass surgery.  (AR 82.)  Plaintiff did not return to his position after a

6  union strike.  (AR 84.)  When asked if there was a point when he could not return to the job because of

7  his condition, plaintiff could not honestly say he could not return if offered to do so.  (AR 86.)  Later

8  plaintiff testified he was physically unable to return to the job after August 5, 1994 because he would

9  have been unable to rest his feet.  (AR 86, 87.)  To address his leg swelling problems, plaintiff propped

10  his feet on his desk every two hours.  (AR 87.)

11      After plaintiff left his tire quality control technician job, he performed an office cleaning job for

12  two weeks.  (AR 60.)  Plaintiff last worked at a nursing rehabilitation facility during September 1998

13  to May 1999.  (AR 59.)  The work included changing lightbulbs and repairing bed fixtures and hospital

14  beds.  (AR 61.)  Plaintiff worked from 7 a.m. to 3-3:30 p.m. Monday through Friday and at times had

15  overtime.  (AR 62, 65.)  The job required plaintiff to be on his feet and to lift up to 20 pounds.  (AR 65.)

16  Plaintiff stopped working at the hospital when it was acquired by another company which did not rehire

17  plaintiff.  (AR 64.)  Plaintiff's left leg swelling required plaintiff to elevate his feet every 1-2 hours for

18  10-15 minutes when he worked at the nursing rehabilitation facility, and plaintiff's supervisor

19  accommodated plaintiff.  (AR 69, 71.)  Plaintiff elevated his leg for 1.5 hours during the workday and

20  worked 5.5-6 hours a day.  (AR 100.)  Plaintiff elevated his leg during his 30-minute lunch and two 15-

21  minute breaks.  (AR 101.)  Plaintiff also elevated his leg between his lunch and breaks.  (AR 102.)

22      Plaintiff's doctors have urged plaintiff to lose weight but medication prevents plaintiff to do so.

23  (AR 57-58.)  Plaintiff has not had to go back for "any major things" since his 1993 coronary bypass.

24  (AR 68.)  Plaintiff's left leg swells constantly from the inside thigh to ankle.  (AR 69.)  Plaintiff

25  experiences occasional throbbing left leg pain.  (AR 99.)  During 1994-1999, plaintiff needed to devote

26  approximately 1.5 hours daily to elevate his leg.  (AR 106.)

27      For his high platelet count, plaintiff treated with Hydrea, a fairly toxic chemo pill.  (AR 72.)

28  Plaintiff switched to Agrylin, which is better than Hydrea.  (AR 73.)  Plaintiff discovered his high

platelet count during a job sponsored medical examination in 1992.  (AR 73.)  Plaintiff's platelet condition weakens him.  (AR 74.)  Plaintiff has not regained his strength.  (AR 79.)

Plaintiff has developed "a nodal type thing" on his right heal which causes pain.  (AR 92.)

Plaintiff does small things around the house.  (AR 89.)  Bringing groceries in is plaintiff's most strenuous activity at home.  (AR 91.)  Plaintiff walks for half an hour.  (AR 91.)  Plaintiff attends his grandson's sporting events.  (AR 95.)  Plaintiff enjoys woodcrafting, including picture frames and shelves.  (AR 99.)

### Plaintiff's January 8, 2002 ALJ Hearing Testimony

Plaintiff testified at the January 8, 2002 ALJ hearing that during September 1998 to May1999, plaintiff performed light maintenance work for eight hours a day five days a week at a rehabilitation nursing facility.  (AR 115, 116.)  To assist plaintiff's leg swelling, plaintiff's supervisor allowed plaintiff to prop up his legs for about 20 minutes every couple hours.  (AR 115.)  Plaintiff experienced unexplained chest tightness on the job.  (AR 116.)  Plaintiff was not rehired when the facility was sold.  (AR 126.)

To treat his coronary artery disease, plaintiff has had multiple angioplasty and four stent placements.  (AR 117, 131.)

For his right foot, plaintiff received a cortisone shot and orthotics for his shoe.  (AR 118.)  Plaintiff's foot bothers him when he is on his feet for long periods and on hard surfaces.  (AR 118.)

Plaintiff experiences shoulder problems in that he is unable to raise his shoulder or his hand above his shoulder.  (AR 120.)  Plaintiff has difficulty pulling from the side.  (AR 120.)

Plaintiff has swelling in both legs which requires medication and elevation.  (AR 120.)  Plaintiff is to raise his legs above his heart.  (AR 121.)  Plaintiff raises his legs four times daily.  (AR 121.)

Plaintiff left his tire quality control technician job when his union went on strike.  (AR 140.)  Plaintiff was advised to retire to maintain health insurance.  (AR 140.)  Plaintiff did not leave the job initially because of disability.  (AR 141.)

### Vocational Expert Cheryl Chandler's January 8, 2002 ALJ Hearing Testimony

Vocational expert Cheryl Chandler ("Ms. Chandler") attended the January 8, 2002 ALJ hearing.  In response to the ALJ's question, Ms. Chandler noted that a job allowing multiple hours a day of non-

1  break and non-lunch time to elevate legs is uncommon and for which employers are unwilling to pay

2  a competitive wage.  (AR 142.)  Ms. Chandler characterized such work as sheltered.  (AR 142.)

3       Ms. Chandler characterized plaintiff's tire quality control technician job as skilled work with

4  limited transferability.  (AR 143.)  Ms. Chandler categorized plaintiff's tire quality control technician

5  job in the competitive economy as generally medium.  (AR 143.)  Ms. Chandler categorized plaintiff's

6  work at the nursing rehabilitation facility as semi-skilled and medium.  (AR 143.)

7  **The ALJ's Findings**

8       In his May 30, 2002 decision, the ALJ identified the primary issue whether plaintiff is disabled.

9  (AR 25.)  In concluding that prior to January 1, 2000, plaintiff retained the residual functional capacity

10  to engage in light exertion and was not entitled to disability insurance benefits (AR 32, 33), the ALJ

11  found:

12      1.    Plaintiff has a history of arteriosclerotic heart disease, status post coronary bypass

13          surgery, essential thrombocythemia or thrombocytosis, and occlusion of previously

14          stented left anterior descending artery but lacked an impairment in section 4.04 of the

15          Listing of Impairments.

16      2.    Plaintiff's allegations of severe pain and limitations are not fully credible.

17      3.    Prior to January 1, 2000, plaintiff retained the residual functional capacity to perform the

18          physical exertion requirements of work, except lifting more than 20 pounds occasionally

19          and 10 pounds frequently, walking and/or standing up to six hours in a workday, and

20          sitting up to six hours in a workday.

21      4.    Prior to January 1, 2000, plaintiff's impairments did not prevent plaintiff to perform his

22          past relevant work as a quality control technician.

23      5.    Plaintiff was disabled no earlier than January 1, 2000.  (AR 32.)

24  **DISCUSSION**

25  **Standard Of Review**

26       Congress has provided limited judicial review of a Commissioner's decision made through an

27  ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ,

28  when the determination is not based on legal error and is supported by substantial evidence.  *See Jones*

*v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[2]   Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

        The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

        This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

        Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete and detailed objective medical reports of his condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled.");  20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

---

        [2]          "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

1    whether you are disabled or blind.  You are responsible for providing that evidence.")

2    _____Here, plaintiff claims disability since August 8, 1994 due to heart disease, blood disorder, status

3    post heart bypass surgery, stress, arm, leg and shoulder weakness, and chest, joint and upper extremities

4    pain.  (AR 25, 440, 453.)

5    _____With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's May 30,

6    2002 decision.

7    **<u>Onset Date – Substantial Evidence</u>**

8    Plaintiff identifies the general issue as whether plaintiff was disabled between his alleged August

9    8, 1994 disability onset date and January 1, 2000, the ALJ's disability date.  The Commissioner responds

10   that the ALJ's January 1, 2000 disability date is supported by substantial evidence.  The Commissioner

11   correctly notes that plaintiff bears the burden to demonstrate inability to perform his past work.  *See*

12   *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005.)

13   After thoroughly reviewing the medical evidence and plaintiff's treatment (AR 26-29), the ALJ

14   addressed plaintiff's pre-January 1, 2000 condition:

15   . . . Prior to January 1, 2000, claimant demonstrated his ability to perform light work
     activity, despite his subjective complaints.  For example, on October 15, 1998, Dr. Hsu
16   reported that claimant had found a maintenance job at a local extended care facility and
     seemed to be doing well (Exhibit 21, p. 6).  Claimant testified he took a full-time
17   maintenance position at a convalescent home in September 1998.  Although this work
     activity was described as a "sheltered-type" of activity because claimant was allowed to
18   elevate his legs multiple times during the day, claimant actually testified he was allowed
     to elevate his legs for about 15 minutes every two hours, which would coincide with
19   appropriate breaks taken during an eight-hour workday.  (AR 29.)

20   The ALJ pointed to Dr. Merrill's stress testing revealing plaintiff's excellent exercise tolerance

21   with no evidence of angina or ischemia in August 1994.  (AR 29.)  The ALJ commented that plaintiff

22   "had an excellent surgical result and stability of claimant's coronary artery disease."  (AR 29.)  The ALJ

23   noted Dr. Merrill's opinion that plaintiff "was without angina, heart failure, or arrhymia, and symptoms,

24   signs, and findings relating to his cardiac condition showed that his coronary disease was stable.  Dr.

25   Merrill did not recommend disability or indicate that claimant was limited to sedentary work."  (AR 30.)

26   The ALJ noted Dr. Hsu's notations of minimal ankle edema when plaintiff held his maintenance worker

27   position and that plaintiff was walking two miles a day with no edema during 1993.  (AR 29.)  The ALJ

28   properly observed that "Dr. Hsu's treating records show claimant's signs and findings to be within a

1  normal range with claimant's conditions being well controlled and asymptomatic." (AR 30.) The ALJ

2  noted that Dr. Tu had reasonably pinpointed disability to January 1, 2000. (AR 29.) In sum, the ALJ

3  pointed to substantial evidence to support his January 1, 2000 disability date.

4       As noted by the Commissioner, the substantial medical evidence reveals plaintiff's generally

5  good condition until 2000 when he required further cardiac procedures. Testing of cardiologist Dr.

6  Merrill demonstrated normal heart rate and blood pressure response to exercise, excellent exercise

7  tolerance, and absence of angina pectoris or subendocardial ischemia. (AR 500, 508, 608, 609, 704.)

8  Dr. Merrill encouraged plaintiff to increase daily exercise. (AR 500.) As of February 4, 1997, Dr.

9  Merrill noted that plaintiff "is doing well clinically without angina, heart failure, or arrhythmia

10  symptomatology." (AR 723.) Dr. Merrill found stability of plaintiff's coronary disease without active

11  ischemia. (AR 723.)

12       On March 20, 1998, cardiologist Dr. Hanks noted that plaintiff had no significant complaints.

13  (AR 751.) A December 16, 1998 stress test revealed "outstanding exercise capacity" and "unremarkable

14  cardiopulmonary assessment." (AR 1039.) On December 22, 1999, plaintiff "confirmed the absence

15  of significant symptoms in the last year." (AR 252.) A December 22, 1999 stress test revealed

16  "[e]xcellent exercise capacity," negative test for angina pectoris, claudication, arrhythmia, ischemia and

17  scar. (AR 249, 935.) A February 22, 2000 stress test revealed an unremarkable pressure response to

18  exercise and negative for angina pectoris, claudication and arrhythmia. (AR 387, 990.) A June 20, 2000

19  stress test revealed excellent exercise capacity. (AR 1036.)

20       Oncologist Dr. Hsu consistently noted that plaintiff was doing "well" or "very well" and the

21  absence of chest, bone or leg pain, dyspnea, headache, dizziness, leg cramps, night sweats,

22  thromboebolic problems, or medication side effects. (AR 524, 528, 531, 532, 535, 536, 538, 708, 712,

23  715-717, 759-766, 774, 775.) Dr. Hsu achieved good platelet reduction and control with Hydroxyurea

24  (AR 524, 532, 535, 536, 544, 774, 775.) Dr. Hsu switched plaintiff to Agrylin, a new drug, and

25  continued to achieve good results. (AR 759-763, 765, 766, 772.) Dr. Hsu encouraged an exercise

26  program for plaintiff. (AR 764.)

27       During 1999-2001, oncologist Dr. Chatrath consistently noted that plaintiff "looks and feels

28  well" along with his stable platelet count, excellent clinical performance status, absence of clinical

1  evidence of bleeding or thrombotic complications.  (AR 267, 334, 336, 340, 341, 859, 949, 952, 954,

2  955, 1111-1114, 1117, 1118, 1120, 1121, 1124, 1125, 1127, 1128, 1131, 1132, 1136, 1137, 1189-1192.)

3      In light of the substantial evidence, plaintiff fails to demonstrate error in the ALJ's January 1,

4  2000 disability date.

5  **Plaintiff's Contentions Of ALJ Error**

6      Plaintiff claims that the ALJ committed several errors to find a January 1, 2000 disability date.

7  Plaintiff contends that the ALJ did not comply with the Appeals Council's April 19, 2001regarding

8  further medical opinion.  More specifically, plaintiff objects to the ALJ's use of interrogatories to Dr.

9  Tu and "choosing himself what was the material" for Dr. Tu "to see."

10      As noted by the Commissioner, the Appeals Council's April 19, 2001 order is not a final agency

11  decision subject to this Court's review.  *See Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457

12  (1975).  The Appeals Council denied plaintiff's request to review the ALJ's May 30, 2002 decision and

13  raised no issue as to ALJ's securing further medical opinion.

14      Moreover, plaintiff's counsel reviewed the materials submitted to Dr. Tu and voiced his concerns

15  as to the materials supplied by the ALJ and Dr. Tu's conclusions.  (AR 1194-1196, 1206, 1219.)  "The

16  essence of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."

17  *Boettcher v. Secretary of Health and Human Services*, 759 F.2d 719, 723 (9th Cir. 1985) (citing *Mathews*

18  *v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976)).  "[A]n opportunity to be heard reduces the

19  risk of error and enhances the opportunity to present all the relevant facts."  *Boettcher*, 759 F.2d at 723.

20  The ALJ addressed plaintiff's criticisms:

21      Although the attorney submitted arguments regarding the contents of the cover letter to
    Dr. Tu (Exhibits 49, 52), the undersigned finds the reasons for such to be unfounded and

22      the undersigned rules against those objections. The contents of the letter of interrogatory
    was based on various exhibits contained in a voluminous record and specifically

23      contained every exhibit requested to be sent by the claimant. Dr. Tu was not led to his
    conclusion. Actually, Dr. Tu pointed out that the treadmill stress test performed in

24      September 2000 was the first documented study that demonstrated substantially impaired
    exercise capacity, whereas the earlier test in March 2000 failed to show any significant

25      impairment. Dr. Tu also pointed out that Dr. Hanks indicated claimant experienced
    intermittent chest discomfort since May 1, 2000. It appears that if Dr. Tu was "led" in

26      any way, it was to give claimant the benefit of doubt that he met the Listing 4.04 as early
    as January 2000. (AR 31; underlining in original.)

27

28  Plaintiff points to neither procedural nor substantive error in the ALJ's acquisition or handling

of Dr. Tu's assessment.  As noted by the Ninth Circuit Court of Appeals, assistance of consultative physicians to an ALJ "is obvious": "The analysis and opinion of an expert selected by the ALJ may be helpful to the ALJ's adjudication, and we should not impose 'burdensome procedural requirements that facilitate . . . second-guessing [the ALJ's resolution of conflicting medical testimony].'" *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (quoting *Allen v. Heckler*, 749 F.2d 577, 580 (9th Cir. 1985)). Plaintiff unduly attempts to second guess the ALJ and fails to demonstrate Dr. Tu's assessment is deficient to accord it no weight as plaintiff suggests.

Plaintiff asserts that "the ALJ wrongly concludes that something happened" on January 1, 2000 to change plaintiff's disability from light to sedentary exertional level.  Plaintiff ignores Dr. Hanks' December 22, 1999 notation that plaintiff "confirmed the absence of significant symptoms in the last year" and that Dr. Hanks performed January 24, 2000 procedures which revealed deteriorating condition. (AR 227, 252, 913, 1173.)  On January 24, 2000, Dr. Hanks noted plaintiff's "classic angina."  (AR 252.)

Plaintiff argues that "to deny this case, the ALJ had to discredit the treating physicians' opinions . . . and he did so, without true and sufficient rationale."  As a reminder, a treating physician's opinion is not conclusive as to a claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes*, 881 F.2d at 751; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[3]  An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes,* 881 F.2d at 751.  Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

The Ninth Circuit has further explained:

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate

---

[3]      A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e). The Commissioner has final responsibility to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

1   reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ
2   can meet this burden by setting out a detailed and thorough summary of the facts and
    conflicting clinical evidence, stating his interpretation thereof, and making findings." .
3   . . The rule . . . does not apply, however, "when the nontreating physician relies on
    independent clinical findings that differ from the findings of the treating physician." . .
4   . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical
    tests, it must be viewed as substantial evidence . . .'"

5   *Magallanes*, 881 F.2d at 751(citations omitted.)

6        An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See,*

7   *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

8   claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

9   have been "properly discounted."  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v.*

10  *Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d

11  520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able

12  to find a link between [claimant's] complaints and known medical pathologies").

13       "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

14  testimony, and for resolving ambiguities."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

15  Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

16  specific, legitimate reasons to reject the opinion.  *Matney*, 981 F.2d at 1020.

17       Plaintiff points to Dr. Hsu's August 30, 1997 assessment that plaintiff is able to sit or stand two

18  hours during an eight-hour day and walk two or three miles but must lie down or elevate his legs every

19  two or three hours.  (AR 737.)  The ALJ discounted Dr. Hsu's assessment:

20       Dr. Hsu was not specific and he never referred to "disability" in any of his progress
         notes. . . . However, it should be noted that Dr. Hsu was an internist and not a
21       cardiologist, and he actually deferred to the opinion of claimant's cardiologist regarding
         claimant's work-related limitations secondary to his principle diagnosis of heart disease.
22       As noted above, Dr. Hsu's treating records show claimant's signs and findings to be
         within normal range with claimant's conditions being well controlled and asymptomatic.
23       Because of the inconsistency between his own progress notes and the sedentary
         assessment he provided, little weight is given the sedentary assessment.  (AR 29-30.)
24

25       The ALJ properly pointed to inconsistency with Dr. Hsu's progress notes and lack of supporting

26  evidence for Dr. Hsu's assessment.  This Court defers to the ALJ's resolution of the ambiguities and

27  conflicts as to Dr. Hsu's assessement.

28       Plaintiff also points to Dr. Lusby's September 16, 1997 assessment that plaintiff is able to sit,

stand or walk two hours during an eight-hour day and must lie down or elevate his legs every two or three hours during an eight-hour day.  (AR 749.)  The ALJ rejected Dr. Lusby's assessment:

> Ironically, this opinion is not supported by the doctor's own treatment records, nor are they supported by the clinical signs and reported symptoms reflected in the evidence as a whole.  The medical evidence, as noted above, shows claimant's symptoms, signs, and findings to be stable or within normal limits.  In addition, there is no indication the treating source used the legal standards and considerations as prescribed by the Social Security Act in any one of his assessments of the claimant's condition.  Although Dr. Lusby is a treating source, merely checking items or limitations without supporting documentation does not present a persuasive argument and accordingly is not binding upon the undersigned or the Social Security Administration, and is not entitled to significant evidentiary weight.  (AR 27.)

Again, the ALJ properly noted a lack of support, in this case, for Dr. Lusby's assessment.   The ALJ thoroughly summarized the medical record and conflicting evidence (AR 26-29) and provided his rational interpretation and findings.  Plaintiff demonstrates no error in the ALJ's evaluation of Dr. Hsu and Dr. Lusby's assessments.

Plaintiff complains that the ALJ made an "oral offer" of a disability onset prior to January 1, 2000, the date which the ALJ selected in his May 30, 2002 decision.  Although plaintiff prefers an earlier disability date, the issue, as noted by the Commissioner, is whether substantial evidence supports a January 1, 2000 disability date.  As explained above, substantial evidence supports the January 1, 2000 date.

Plaintiff challenges the ALJ's evaluation that plaintiff's maintenance job at the nursing rehabilitation facility was substantial gainful activity.  Substantial work activity involves "significant physical or mental activities," even part time.  20 C.F.R. § 404.1572(a).  Gainful work includes that done for "pay or profit."  20 C.F.R. § 404.1572(b).  Plaintiff's testimony supported that his maintenance job was substantial gainful activity.  Plaintiff noted that the job involved maintenance, including hospital bed repairs, during a full-time schedule with overtime.  (AR 61, 62, 65, 115, 116.)  Plaintiff stopped the work after the hospital was acquired by another company which did not retain plaintiff.  (AR 64, 126.)  Although plaintiff's supervisor allowed plaintiff to prop up his feet every couple of hours (AR 115), plaintiff's work under such "special conditions" may demonstrate that plaintiff had the "necessary skills and ability to work at the substantial gainful activity level."  20 C.F.R. § 404.1573(c).  Plaintiff demonstrates no error in the ALJ's evaluation of plaintiff's maintenance job.

**Plaintiff's Credibility**

Plaintiff challenges the ALJ's finding that plaintiff's allegations of severe pain and limitations were not "fully credible." The Commissioner responds that the ALJ properly supported his credibility finding and adequately rejected plaintiff's claim that he was unable to work prior to January 1, 2000.

"Credibility determinations are the province of the ALJ." *Fair*, 885 F.2d at 604; *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988). "An ALJ cannot be required to believe every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

A claimant bears an initial burden to "produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)). If a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d at 1284.) "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959. A reviewing court will not reverse an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). Moreover, "the ALJ is entitled to draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c). An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* S.S.R. 96-7p.[4]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.   The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.   Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.   Type, dosage, effectiveness, and adverse side-effects of pain medication;

4.   Treatment, other than medication, for pain relief;

5.   Functional restrictions;

6.   Claimant's daily activities;

7.   Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.   Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After detailing plaintiff's medical treatment and testimony, the ALJ properly questioned plaintiff's credibility. The ALJ noted plaintiff's activities of gardening, light woodworking, painting, driving, visiting friends and relatives, treadmill walking, shopping, light household chores and

---

[4]   Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

maintenance, socializing and church attendance.  (AR 30.)  The ALJ correctly observed that "the physical and mental capabilities requisite to performing many of these household and social tasks replicate those necessary for obtaining and maintaining employment."  (AR 30.)

The ALJ pointed to further doubts as to plaintiff's credibility:

> Furthermore, it is relevant that one of the reasons claimant requested "disability" from Dr. Lusby was because he was not able to find work and not that he was unable to perform work.  It is notable that at the time claimant saw Dr. Lusby on October 3, 1994 and presented complaints of lethargy and some chest pain, he saw Dr. Hsu on October 13, 1994 and reported doing very well with no reported chest pain, etc. (Exhibit 7, p. 6).  Claimant's failure to report any cardiac symptoms to Dr. Hsu suggests claimant might have been attempting to obtain a "disability" status from Dr. Lusby since he could not find employment at the time.  (AR 30.)

The ALJ adopted the evaluation of plaintiff's credibility outlined in the June 27, 1997 ALJ decision:

> Although claimant seemed to be a sincere witness, it appears that the conclusions he has reached regarding his symptoms and the extent of the related limitations are overstated and not consistent with the medical record.  For example, claimant's treating and examining physicians consistently characterized his condition as 'stable', 'controlled', 'well-controlled', and 'doing well', which seems quite disproportionate to a severity of limitations that prevent work activity as alleged by claimant.  (AR 30-31.)

The ALJ pointed to other inconsistencies to discount plaintiff's claims:

> . . . For example, although claimant states he is unable to work due to his impairments, he did perform work activity in 1998-1999 as a maintenance man.  He stopped working because of a change in management and not because of disability.  Claimant failed to follow through with his doctor's recommendations to lose weight and increase his exercise, the lack of which physicians indicated were the cause of his mild symptoms of fatigue and joint pains.  (AR 31.)

As outlined above, the ALJ provided specific findings and clear, convincing reasons to discredit the degree of limitation claimed by plaintiff.  In addition to outlining plaintiff's activities, the ALJ noted discrepancies between the success of plaintiff's treatment and his claims.  Of key importance, the ALJ noted that plaintiff ceased his tire quality control technician job due to a strike and his hospital maintenance job due to a change in ownership.  The record raises the inference that plaintiff would have continued to work but for strike and ownership issues beyond his control.  The ALJ logically inferred that plaintiff sought disability from Dr. Lusby despite his good reports to Dr. Hsu.  Moreover, plaintiff testified that he could not honestly say he could not return if offered to do so but later claimed he was

1   physically unable to return to work after August 5, 1994 because he would have been unable to rest his

2   feet.  (AR 86, 87.)  In addition, in a June 1, 1999 form, plaintiff claimed inability to work since June

3   1999, not earlier as he asserts here.  Substantial evidence supports the ALJ's specific findings on

4   plaintiff's credibility to preclude this Court to second guess the ALJ.  Plaintiff demonstrates neither error

5   in the ALJ's evaluation of plaintiff's credibility nor inadequacy of the ALJ's grounds to discount

6   plaintiff's claims.

7   <u>**CONCLUSION AND RECOMMENDATION**</u>

8         For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

9   properly concluded plaintiff was not disabled prior to January 1, 2000.  This Court further finds the

10  ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal

11  standards.  Accordingly, this Court RECOMMENDS to:

12        1.    DENY plaintiff's request to reverse the Commissioner's decision that plaintiff was not

13             disabled prior to January 1, 2000 or to remand for further proceedings; and

14        2.    DIRECT this Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart,

15             Commissioner of Social Security, and against plaintiff Tony Silva and to close this

16             action.

17        These findings and recommendations are submitted to the district judge assigned to this action,

18  pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304.  No later than June 13, 2006,

19  any party may file written objections to these findings and recommendations with the Court and serve

20  a copy on all parties and the magistrate judge and otherwise in compliance with this Court's Local Rule

21  72-304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and

22  Recommendations."  Responses to objections shall be filed and served no later than June 23, 2006 and

23  otherwise in compliance with this Court's Local Rule 72-304(d).  A copy of the responses shall be

24  served on the magistrate judge.  The district judge will review the magistrate judge's findings and

25  recommendations, pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file

26  objections within the specified time may waive the right to appeal the district judge's order.  *Martinez*

27  ///

28  ///

1   *v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

2         IT IS SO ORDERED.

3   **Dated:    May 30, 2006**              _____/s/ Lawrence J. O'Neill_____
    66h44d                                UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31